(C.D. 2796)

D. E. Sanford Co.
W. J. Byrnes & Co. et al. } v. United States

United States Customs Court, Second Division

(Decided October 19, 1966)

*Glad & Tuttle* (*George R. Tuttle* of counsel) for the plaintiffs.
*J. William Doolittle*, Acting Assistant Attorney General (*Andrew P. Vance* and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before Rao, Ford, and Richardson, Judges

Richardson, Judge: The instant merchandise, described on the commercial invoices as "iron covers" or "cast covers" under the general heading of Enameled Iron Cookware or Enameled Iron Cookingware, was exported from Belgium, entered at San Francisco, Calif., and classified in liquidation under 19 U.S.C.A., section 1001, paragraph 397 (paragraph 397, Tariff Act of 1930), as modified in T.D. 54108, as articles or wares, not specially provided for, in chief value of metal, at the modified rates of duty. It is claimed in the protests which have

been consolidated for trial that the subject merchandise is properly classifiable under 19 U.S.C.A., section 1001, paragraph 339 (paragraph 339, Tariff Act of 1930), as modified in T.D. 54108, as a household utensil, composed of iron or steel and enameled or glazed with vitreous glasses, at the modified rates of duty.

The issues presented for determination are (1) whether the items of merchandise at bar, commonly known as pot, pan, and skillet covers, are "utensils" as that term is used in paragraph 339, and (2) whether the covers are composed of iron or steel enameled or glazed with vitreous glasses.

The evidence in the record consists of testimony of three witnesses produced on behalf of the importer, the official papers, and another document containing a summary of the various covers on the invoices, samples of the involved merchandise and a number of pots, pans and skillets. The Government offered no evidence.

Robert M. Betette, president of Armbee Corporation, an importer of housewares, giftwares and flowers, testified, among other things, that he was formerly employed by the firm of D. E. Sanford Co. first, as a salesman of various housewares, and then, as of the time of the involved importations, he worked in the office with the larger accounts, and in training demonstrators of merchandise handled by the firm, that the covers involved herein were from a line of merchandise imported by D. E. Sanford Co. called Descoware, that to avoid the accumulation of dead inventory of covers, the firm designed for manufacture abroad pot covers of the type here involved for interchangeable use with pots, pans and skillets either of the same line, or those of a competitor's line, that the covers usually comprised about 75 percent of the total number of units of Descoware ordered at any one time, and that the covers were very often sold as separate items in stores handling Descoware. In answer to a question put to the witness by the court as to the distinguishing characteristics of Descoware from a cookbook point of view, Mr. Betette testified:

THE WITNESS: Well, number one is it's colorful. That was the first appeal I think that came from advertising, but the entire story was the fact that it's cast iron. It's a molten metal, and does not have any, in effect, knots in the metal where heat can concentrate and burn food. You get an even heating in cast iron, whether it be black cast iron, or whether it be Descoware type cast iron, and the fact that it was glazed gave it a finish of glass that made it easy to clean. Another thing, with a low heat food does not readily stick, and it's easier to clean. Primarily, those were the basic features.

J. L. Simmers, employed by Sanford Sales Company, a manufacturer's representative, testified that he was associated with the D. E. Sanford Co. at the time they were importing Descoware, and that he replaced Mr. Betette in planning the sale of the merchandise. Mr.

Simmers testified at some length regarding the various pots, pans and skillets with which the Descoware covers could be used. He stated that the uses of the Descoware covers were to prevent grease from popping out, to hold in the heat, and to cook on a lower heat and conserve fuel. At one point in his testimony, Mr. Simmers was asked to summarize why Descoware covers are desirable for use with other lines of kitchenware. In answer to this question, he testified:

Well of course, ease of cleaning is one of the important things, because having this porcelain finish it washes in the same manner of a china plate. Secondly, the fact that it is made of cast iron it retains the heat, and will prevent the heat from evaporating out through the top of the cover as readily as it would with the thin aluminum or steel cover. Third, there is sufficient weight that in the case of boiling water, or any food that would be cooking at a high speed, the cover will remain down solid on the sauce pan, and doesn't have a tendency to bounce as do the lighter covers.

And Helene Walkemeyer, a sales clerk in the housewares department of Macy's testified, among other things, that prior to 1953 she was employed by the D. E. Sanford Co. as a demonstrator, and promoted the Descoware line with stores and retail merchants. She testified that she promoted and introduced the Descoware line to the public at different stores by cooking for the customers at the stores and by handling sales promotions with the customers, that she has used the Descoware covers interchangeably on Descoware Dutch ovens, skillets and saucepans, and that Descoware covers can be used very easily with pots and pans of various manufacture. The witness also stated that at Macy's she has made numerous sales of Descoware covers separately and without the saucepans or skillets.

The competing tariff provisions involved herein read in material part as follows:

Paragraph 397, as modified in T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

   *        *        *        *        *        *        *

    Not wholly or in chief value of tin or tin plate:

 *        *        *        *        *        *        *

        Other, c o m p o s e d wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum * * *. [Depending upon date of entry.]

                        21%        20%        19%

                      ad. val.    ad. val.    ad. val.

Paragraph 339, as modified in T.D. 54108:

Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for, whether or not containing electrical heating elements as constituent parts:

\*    \*    \*    \*    \*    \*    \*

Composed of iron or steel and enameled or glazed with vitreous glasses.

[Depending upon date of entry.]

| 2.25¢ per lb. and 7% ad val. | 2.15¢ per lb. and 6½% ad. val. | 2¢ per lb. and 6⁴⁄₁₀% ad val. |
|---|---|---|

On the record before us, we are of the opinion that the Descoware covers here involved are "utensils" within the meaning of paragraph 339. The merchandise responds to the definition of the term "utensils" which has been found acceptable to the courts. In *Frank P. Dow Co., Inc.* v. *United States*, 21 CCPA 282, T.D. 46816, a case involving classification of electric vacuum cleaners and floor polishers, the court relied upon the following definitions of the word "utensil" for classification of the merchandise as household utensils:

*Utensil, n.* An instrument or vessel, esp. one used in a kitchen or dairy. (Webster's New International Dictionary.)

*Utensil, n.* Something that is used; a thing serving a useful purpose; formerly, a thing of varied use; as, *utensils* of war or observation; now more especially, an implement or vessel for domestic or farming use; as kitchen utensils. (Funk & Wagnalls' New Standard Dictionary.)

*Utensil, n.* An instrument or implement; as, utensils of war; now, more especially, an instrument or vessel in common use in a kitchen, dairy, or the like, as distinguished from agricultural *implements* and mechanical *tools.* (Century Dictionary & Cyclopedia.)

In the light of the testimony, there can be little doubt that the merchandise at bar performs a useful function.

However, in *Rothschild, Meyers & Co.* v. *United States*, 30 Treas. Dec. 405, Abstract 39374, which is cited in the briefs of counsel for both parties, the court limited classification of "utensils" under a provision for hollow ware in the Act of 1913 to articles possessing a utility value in and of themselves, and consequently rejected the collector's classification of iron pot covers under that provision because the court found that the covers performed no separate function in and of themselves. The court there concluded that the covers were at best parts of hollow ware, which, in the absence of a tariff provision for parts, could not be classified under the provision for hollow ware.

We are not inclined toward the view that the involved covers are "parts" of pots, pans and skillets, granting that these covers perform no utilitarian functions in and of themselves other than those fugitive functions which imagination might suggest to the user. The testimony in the record before us indicates that these articles are complete instruments in and of themselves, and capable as such of sustained use apart from covers. Consequently, we cannot say that covers constitute integral parts of pots, pans or skillets. We think they are more aptly described as accessories, designed for use with pots, pans and skillets to enable these latter articles to perform their functions more efficiently and quickly. In many cases as the testimony shows, covers are not even sold with the pots, pans and skillets they are designed to fit.

The concept that an article must possess some utilitarian function in and of itself in order to be designated a "utensil" seems to have been rejected in cases decided after the decision in the *Rothschild* case. In *F. W. Woolworth Co.* v. *United States*, 26 CCPA 221, C.A.D. 20, a metal animal figure designed to hold a pencil but possessing no utility value in and of itself, was held to be a household utensil. In *Davies, Turner & Company* v. *United States*, 47 CCPA 129, C.A.D. 744, water mixers designed for use in the unification of old fashioned separate hot and cold water sink faucets, were held to be properly classified as household utensils, notwithstanding the fact that the items were devoid of any utilitarian value in and of themselves. And see *Lipman's* v. *United States*, 52 Cust. Ct. 98, C.D. 2444, *affirmed on other grounds, United States* v. *Lipman's*, 52 CCPA 59, C.A.D. 859, where nozzles designed for attachment to water hoses but posessing no utilitarian capabilities in and of themselves, were nevertheless, held by this division of the Customs Court to be household utensils within the meaning of paragraph 339. On the basis of the foregoing authorities and considerations, we think that the importer has sustained its burden of establishing that the articles involved herein are household and kitchen utensils as those terms are used in paragraph 339.

As for the composition of the covers at bar, the evidentiary record before us is not satisfactory. Even if indulgence in the presumption of correctness of the classification of the merchandise before us allows us to conclude that the involved covers are manufactured of iron, the importer has adduced no evidence that the covers are enameled or glazed with vitreous glasses. One of the importer's witnesses testified that the covers are glazed with a "finish of glass," while still another witness called on behalf of the importer testified that the covers had a "porcelain finish." This is the extent of the testimony touching upon the finish applied to these covers.

None of these witnesses, in our estimation, have demonstrated that they possess any qualifications which enable them to testify with any degree of expertise as to the composition of the covers. These witnesses are connected with the sales end of the industry, and not with the manufacturing end of the industry. Under the circumstances, we must regard their testimony on the subject as being but hearsay.

We might, in all fairness to the importer, say that to us the covers look and feel like they have been glazed or enameled. Beyond this, we would be hazarding a guess to attempt to determine the composition of the finish. Therefore, on this branch of the case, we must conclude that there has been insufficient proof. Inasmuch as the importer has failed to bring itself within the provisions of paragraph 339 by competent evidence, the presumption of correctness of the classification of the merchandise at bar has not been overcome. It follows that the protests must, therefore, be overruled.

Judgment will be entered accordingly.